UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                       :
SARAH ANN BATTINO, *et al.*, individually and          :
on behalf of all others similarly situated and as      :
class representatives,                                  :
                                                       :
                              Plaintiffs,      :          09 Civ. 4113 (JPO) (MHD)
                                                       :
              -v-                              :               OPINION AND
                                                       :                 ORDER
CORNELIA FIFTH AVENUE, LLC; SPA                :
CHAKRA FIFTH AVENUE, LLC; CORNELIA             :
ESSENTIALS, LLC, CORNELIA ZICU                 :
INTERNATIONAL 401(K) PLAN; RICHARD             :
AIDEKMAN; ELLEN SACKOFF; and                   :
MICHAEL CANIZALES,                             :
                              Defendants.  :
                                                       :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

        This is a collective action for unpaid wages under the Fair Labor Standards Act, 29

U.S.C. §§ 201, *et seq.* ("FLSA") and a class action for violations of the Employee Retirement

Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.* ("ERISA"), and New York state labor

laws.

        Presently before the Court is a motion by one of the defendants, Michael Canizales, for

partial summary judgment (a) dismissing the plaintiffs' complaint as against Canizales; and (b)

dismissing the cross-claims against Canizales by co-defendants Cornelia Fifth Avenue, LLC

("Cornelia Fifth"), Cornelia Zicu International, LLC ("Zicu"), Cornelia International 401(K)

Plan ("Cornelia 401(K)"), Richard Aidekman and Ellen Sackoff (collectively, the "Cornelia

Defendants").

        For the reasons that follow, Canizales' motion is granted in part and denied in part.

1

I.      **Background**

The following facts are drawn from the parties' Local Civil Rule 56.1 Statements and

other submissions in connection with the instant motion, and are undisputed unless otherwise

noted.

A.      **The Parties**

Until February 6, 2009, Defendant Cornelia Fifth owned and operated the Cornelia Day

Resort at One East 52nd Street, New York, New York.  Defendant Richard Aidekman was the

owner of Samson Spas, LLC, which owned defendant Zicu, which, in turn, was the managing

member of Cornelia Fifth.[1]

Defendant Michael Canizales was a part owner and member of defendant Spa Chakra

Fifth Avenue, LLC ("SCFAL").

During 2009, Aidekman entered into negotiations with Canizales to sell certain assets of

Cornelia Fifth to SCFAL.  On February 6, 2009, SCFAL entered into an asset purchase

agreement with Cornelia Fifth (with Richard Aidekman and Defendant Ellen Sackoff as

principals).  (*See* Affidavit of Michael Canizales ("Canizales Aff."), Ex. A, Asset Purchase

Agreement Dated as of February 6, 2009 Among Spa Chakra Fifth Avenue, LLC, as Buyer,

Cornelia Fifth Avenue, LLC, as Seller, and Richard Aidekman and Ellen Sackoff, as Principals,

Dkt. No. 142 ("APA").)

Plaintiffs are a class of individuals who were employees of Cornelia Fifth, and at least

some of whom were also hired by SCFAL.  (Defendant Michael Canizales' Rule 56.1 Statement

of Undisputed Facts in Support of His Motion for Partial Summary Judgment, Dkt. No. 143

---

[1] Plaintiff states that defendant Ellen Sackoff was an owner of Zicu, but the Cornelia Defendants deny this.
(Cornelia Defs. Rule 56.1 Counter Statement of Disputed Facts, Dkt. No. 153.)  Because this is not a material fact
for the resolution of this motion, the Court need not attempt to resolve whether the dispute is genuine.

("Canizales 56.1 Stmt."), ¶ 45.)  They include, *inter alia*, hairstylists, nail technicians, massage therapists, make-up artists, and department managers.  (Third Amended Class Action Complaint, Dkt. No. 109 ("Comp."), ¶¶ 7-68.)  Plaintiffs are allegedly owed wages incurred during the weeks leading up to the closing of the APA that were not paid by Cornelia Fifth or SCFAL.

  **B.**  **The Asset Purchase Agreement**

  The APA contained several provisions relevant to this motion.

  APA § 2.1 identified particular assets that were being purchased by SCFAL, including, *inter alia*, inventory, equipment, certain contracts related to the business, accounts receivable, and goodwill of the business as a going concern.  APA § 2.2 sets forth certain assets that were expressly not being sold, including, *inter alia*, shares of the capital stock of the seller, corporate policies of the seller, all marks, and other documents having to do with the corporate organization of Cornelia Fifth, including seals, charter documents, minute books, stock books, tax returns, and books of account.

  APA § 2.3 sets forth particular liabilities being transferred, and § 2.4 sets forth excluded liabilities.[2]  The latter section provides that "[n]either the Buyer nor any of its Affiliates shall assume any Liabilities of the Seller . . . other than solely those specifically set forth in Section 2.3," and expressly excludes "all other Liabilities, regardless of when made or asserted, which arise out of or are based upon any events occurring or actions taken or omitted to be taken by the

---

[2] Canizales submitted a full copy of the APA as an exhibit to his affidavit, Dkt. No. 142, but did not include the schedules that are incorporated by reference into the agreement.  These schedules set forth additional assets and liabilities that are being transferred or excluded.  Without those documents in the record, the Court is unable to rule as a matter of law which liabilities were or were not transferred.  However, because the Court concludes that there are genuine disputes of material fact on several points, the absence of these schedules was not dispositive of the motion one way or the other.

Seller, or otherwise arising out of or incurred in connection with the conduct of the Business, on or before the Closing Date."  (APA § 2.4.)

Article IV of the APA contains the seller's representations and warranties, including that Cornelia Fifth "has conducted, and is conducting, the Business in material compliance with all applicable laws . . ."; that "[n]o event has occurred and that no circumstances exist that . . . would result in a violation of, conflict with or failure on the part of the Seller to conduct the business in compliance with, any applicable Law"; and that "[t]he Seller has not received notice regarding any violation of, conflict with, or failure to conduct the Business in compliance with any applicable Law."  (APA § 4.8.)  Cornelia Fifth also specifically warranted that "[t]here are, and have been, no violations of any other Law respecting the hiring, hours, wages, occupational safety and health, employment, promotion, termination or benefits of any Business Employee or other Person in connection with the Business."  (APA § 4.18.)

Under Article VI of the APA, containing the parties' covenants, Cornelia Fifth covenanted that "[a]ny and all Liabilities relating to or arising out of the employment, or cessation of employment, of any Business Employee . . . on or prior to the close of business on the Closing Date. . . . shall be the sole responsibility of Seller including wages and other renumeration due through the close of business on the Closing Date . . . ."  (APA § 6.4(b).) Section 6.6 provides that "[f]rom and after the Closing, Seller shall pay and discharge on a timely basis all of the Excluded Liabilities."  (APA § 6.6(a).)

The APA also contained indemnification provisions for each side.  The seller (*i.e.*, Cornelia Fifth) and the principals (*i.e.*, Aidekman and Sackoff) agreed to indemnify "the Buyer [*i.e.*, SCFAL] and its Affiliates and their respective stockholders, members, managers, officers, directors, employees, agents, successors and assigns" for various losses arising in connection

4

with any breach of the APA (including the representations, warranties and covenants) by the seller or its principals.  (APA § 7.2(a).)  The buyer (*i.e.*, SCFAL) agreed to indemnify "the Seller and its Affiliates and their respective stockholders, members, managers, officers, directors, employees, agents, successors and assigns" against, *inter alia*, breaches of the APA or failure to perform the assumed liabilities by SCFAL.  (APA § 7.3.)

### C.    The Running and Subsequent Failure of the Business

After the closing, SCFAL opened the Spa Chakra Fifth Avenue Spa at the former location of the Cornelia Day Resort.  Some, but not all, of the Cornelia Fifth employees were hired by SCFAL.  SCFAL also hired additional new employees who had not worked for Cornelia Fifth.  SCFAL did not sell the Cornelia-branded beauty products that had previously been sold at that location, but the business was operated as a beauty spa.  Customers calling the new spa were informed of the change in the business when they called to make appointments.  SCFAL created a new website for the spa.

Canizales states in an affidavit that "SCFAL had made clear to all of its employees that it was a new company and that they were no longer working for Cornelia Fifth.  They all knew that [Canizales] was now in charge of operations, whereas [he] had no part in the prior operations of Cornelia Fifth."  (Canizales Aff. ¶ 27.)

What happened next is the subject of sharp dispute among the defendants.  There is no dispute that soon after the closing, SCFAL ran into financial difficulty and the business failed less than a year after the closing.  Canizales claims that the failure was a result of various undisclosed liabilities and obligations of the Cornelia Defendants, and the Cornelia Defendants' subsequent refusal to indemnify SCFAL and pay the various liabilities they had agreed to pay in the APA.  For their part, the Cornelia Defendants contend that the failure of the business was due

to Mr. Canizales' violations of the APA.  In particular, they contend that he diverted to his other businesses funds that they had transferred to him pursuant to the APA.  (*See generally* Affidavit of Richard Aidekman (Dkt. No. 150).)

Suffice it to say that there are genuine issues of material fact regarding the precise causes and effects of all of these events, but these issues are not material to the instant motion, so it is unnecessary for the Court to resolve these disputes.  It is, however, undisputed that the business did fail, and that on November 30, 2009, three of SCFAL's creditors filed an involuntary petition against SCFAL under Chapter 7 of the United States Bankruptcy Code; that Spa Chakra, Inc. later filed a Chapter 11 petition; and that both cases were later consolidated into one Chapter 11 case.  After certain reorganization efforts ultimately failed, the Spa Chakra branded spa at One East 52nd Street closed.  It is also undisputed that Richard Aidekman and Ellen Sackoff later filed for bankruptcy protection, but that Cornelia Fifth and Zicu still exist as business entities.

### D.      Plaintiffs' Claims

When Cornelia Fifth sold the assets of the business to SCFAL, it had allegedly not yet paid its employees' wages for January 2009 and February 2009 through the closing date. Canizales states that "[a]t or about the time of the February 6, 2009 closing of the APA, Aidekman told [him] that Cornelia Fifth had not yet paid its employees" these wages, but that "Cornelia Fifth would promptly make arrangements to pay the employees for their wages for the period January 4 through January 17, 2009, by leaving sufficient funds in an operating account to be turned over to SCFAL so that SCFAL could, on Cornelia Fifth's behalf, remit the wage payments to the employees."  (Canizales 56.1 Stmt. ¶ 52.)  Canizales contends that Cornelia Fifth did not turn over accounts containing sufficient funds from which to make these payments, and that "[s]hortly after the closing, Aidekman told [him] that none of the Cornelia Fifth

6

employees would be paid for the period January 18 through January 31, 2009 because Cornelia Fifth did not have the funds to pay them." (*Id.* ¶ 55.)[3]

Plaintiffs submit an affidavit from one of the class members, Amanda Wells, the Director of Marketing and Public Relations for Cornelia Fifth, and subsequently for SCFAL. (Dkt. No. 147 ("Wells Aff.").)  Wells states that after a power-point presentation to the Cornelia Fifth employees by Canizales on February 4, 2009, she overheard Canizales and Aidekman arguing "for several hours" in the next office. (Wells Aff. ¶ 5.)  She states that she heard Canizales tell Aidekman "that Cornelia Fifth would have to be responsible to pay all of the employees, including [herself] and plaintiffs, all outstanding unpaid wages." (*Id.*)

Canizales concedes that he became aware prior to the closing that Cornelia Fifth had not yet paid the employees' wages for January and February 2009, but states that Aidekman assured him that Cornelia Fifth had sufficient assets to make those payments, and would do so. Canizales states that SCFAL "relied on that representation," and states further that

> [t]he fact that this became an issue caused SCFAL to make sure that the APA required Cornelia Fifth to attend to this important obligation precisely so that SCFAL would not face any unanticipated liability.  Thus, Cornelia Fifth represented that it was in compliance with applicable laws pertaining to its employees and that there were no known claims against it.

(Reply Affidavit of Michael Canizales, Dkt. No. 156, ("Canizales Reply Aff.") ¶ 3.)

The parties dispute the significance of certain actions that SCFAL allegedly took after the closing and after it became clear that Cornelia Fifth had not yet paid the employees' back wages. For example, SCFAL offered certain cash advances to the employees against their paychecks to help provide them with assistance until they were fully paid.  Canizales contends that these

---

[3] The Cornelia Defendants dispute numerous aspects of this description of events, but resolution of these factual disputes is ultimately unnecessary to the resolution of this motion.

actions did not amount to an admission of any kind of obligation to pay these wages, but rather

was just an effort to help his employees.  In any event, these issues are not ultimately material to

this motion, as Canizales' potential liability as a successor is not based on any kind of implied

concession based on his actions after the closing.  Instead, any liability on the part of Canizales

would be based on the factors under the relevant test for successor liability.

It is undisputed that Plaintiffs did not file any formal claim for unpaid wages until this

lawsuit was initiated on April 27, 2009.

### E.    Procedural History

Plaintiffs filed this action on April 27, 2009 as a class action under Rule 23 of the Federal

Rules of Civil Procedure, and as a collective action under FLSA.  At that time, the case was

before Hon. Paul G. Gardephe, U.S. District Judge.

The action was initially filed against Cornelia Fifth, Zicu, Cornelia 401(K), Aidekman,

Sackoff, Canizales, and SCFAL.  The complaint alleged one claim against all defendants jointly

and severally under FLSA (Claim 1).  The class action claims included claims against all

defendants jointly and severally under New York labor law, and under New York common law

for breach of contract and the covenant of good faith and fair dealing, and for unjust enrichment

(Claims 2, 3, 6 and 7).  Plaintiffs also brought class action claims under ERISA against the

Cornelia Defendants only (Claims 4 and 5).  The initial complaint included 28 named plaintiffs.

The plaintiffs amended their complaint twice, on August 17, 2009 and September 22, 2009, to

include additional named plaintiffs, ultimately bringing the total number of named plaintiffs to

62.  (Dkt. Nos. 57, 60.)

On November 30, 2010, the Court granted Plaintiffs' motion to amend its complaint to

join an additional defendant, Cornelia Essentials, LLC.  (Dkt. No. 108.)  On December 7, 2010,

Plaintiffs filed the Third Amended Complaint.  (Dkt. No. 109.)  Canizales answered and asserted cross-claims for indemnification and contribution against the Cornelia Defendants and Cornelia Essentials, LLC. (Dkt. No. 110.)  Cornelia Fifth, Zicu, Aidekman, and Sackoff (the "Cornelia Cross-Claimants") each answered and asserted cross-claims for indemnification against Canizales and SCFAL.[4]  (Dkt. Nos. 111-14.) Because SCFAL was already in bankruptcy by that point, all claims against it were stayed.  (*See* Dkt. No. 79.)  Cornelia Essentials, LLC did not file an Answer, and on September 12, 2011, the Court entered a Default Judgment against it.  (Dkt. No. 135.)

On September 30, 2011, the case was reassigned to the undersigned pursuant to this District's Rules for the Division of Business Among District Judges governing the reassignment of cases to new district judges.

On October 17, 2011, Canizales filed the instant motion for summary judgment dismissing the Third Amended Complaint against him, and dismissing the Cornelia Defendants' cross-claims against him.

## II.    Summary Judgment Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009).  A "material" fact is one that might "affect the outcome of the suit

---

[4] Canizales moves for summary judgment dismissing the cross-claims of all of the Cornelia Defendants, including Cornelia 401(K).  (*See* Dkt. No. 140.)  All of the Cornelia Defendants, including Cornelia 401(K), opposed the motion.  (*See* Dkt. No. 152.)  However, unlike the other Cornelia Defendants, Cornelia 401(K) did not assert any cross-claims.  (Dkt. No. 115.)  Thus, Canizales' motion as to Cornelia 401(K) is denied as moot.

under the governing law." *Id.*  The moving party bears "the burden of demonstrating that no material fact exists."  *Miner v. Clinton Cnty., New York*, 541 F.3d 464, 471 (2d Cir. 2008) (citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)).

In resolving this inquiry, the Court must construe "the evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in that party's favor." *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-50, 255 (1986)); *see also Treglia v. Town of Manlius*, 313 F.3d 713, 718-22 (2d Cir. 2002) (noting that on summary judgment, a court must "resolve all ambiguities and draw all factual inferences in favor of the non-movant" (citing *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001))).  In opposing a motion for summary judgment, the non-moving party may not rely on "conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998), or on mere denials or unsupported alternative explanations of its conduct. *See SEC v. Grotto*, No. 05 Civ. 5880, 2006 WL 3025878, at *7 (S.D.N.Y. Oct. 24, 2006). Rather, the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor. *Anderson*, 477 U.S. at 256-57.  To avoid summary judgment, all that is required of the non-moving party is a showing of sufficient evidence supporting the claimed factual dispute as to require a judge or jury's resolution of the parties' differing versions of the truth.  *See Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (citing *Anderson*, 477 U.S. at 248-49).

## III.    Summary Judgment Regarding Plaintiffs' Claims

Plaintiffs seek to hold Canizales liable for the wages that Cornelia Fifth failed to pay. This will ultimately turn first on whether SCFAL can be held liable as a successor to Cornelia

Fifth, and then on whether Canizales can be held personally liable when SCFAL—and not Canizales personally—is the successor entity.

Plaintiffs concede that they cannot sustain a basis for successor liability on the part of Canizales for their New York Labor law and common law claims. Thus, Plaintiffs consent to the dismissal of claims 2, 3, 6 and 7 as against Canizales. (Plaintiffs' Memorandum of Law in Opposition to Defendant Canizales's Motion for Summary Judgment, Dkt. No. 149, ("Pl. Opp.") at 1.) However, Plaintiffs contend that there are, at a minimum, genuine disputes of material fact precluding summary judgment that Canizales is jointly and severally liable with SCFAL as a successor under FLSA.

### A.  Potential Successor Liability of SCFAL

The Second Circuit has not delineated what the proper test for successor liability should be in the FLSA context. Canizales argues that the Court should apply the traditional common law test for successor liability applied in New York, while Plaintiffs argue that the Court should apply the broader "substantial continuity" test applied by federal courts in most labor and employment contexts. Resolution of this question is necessary, as it is potentially dispositive of the motion.

### 1.  Traditional Test

Under the traditional common law test applied in New York, there can be little dispute that Canizales would not be liable as a successor. "Under both New York law and traditional common law, a corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities." *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006) ["*NSI*"] (citations omitted). There are four exceptions to this rule: (1) where the successor expressly or impliedly assumed the predecessor's tort liability; (2) where there was a

consolidation or merger of seller and purchaser; (3) where the purchasing corporation was a mere

continuation of the selling corporation; or (4) where the transaction is entered into fraudulently to

escape such obligations.  *Id.*  (citations omitted).

This case does not fall within any of these four exceptions.  There is no allegation that the

APA was entered into fraudulently to escape any obligations, and in light of the provisions of the

APA setting forth which liabilities were and were not transferred, there can be no dispute that

SCFAL did not expressly or impliedly assume Cornelia Fifth's liabilities for unpaid wages to its

employees.

Nor is there a genuine issue of material fact as to whether SCFAL was a "mere

continuation" of Cornelia Fifth, or entered into a *de facto* merger with Cornelia Fifth.  Courts

have held that the "*de facto* merger" and "mere continuation" exceptions are "so similar that they

may be considered a single exception."  *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45

n.3 (2d Cir. 2003) (citations omitted).  To find a *de facto* merger (or mere continuation), courts

look to the following factors:

> (1) continuity of ownership; (2) cessation of ordinary business and dissolution of
> the acquired corporation as soon as possible; (3) assumption by the purchaser of
> the liabilities ordinarily necessary for the uninterrupted continuation of the
> business of the acquired corporation; and (4) continuity of management,
> personnel, physical location, assets, and general business operation.

*NSI*, 460 F.3d at 209.  The Second Circuit has explained that "'continuity of ownership is the

essence of a merger,' and therefore the exception cannot apply in its absence."  *Douglas v.*

*Stamco*, 363 F. App'x 100, 102 (2d Cir. 2010) (quoting *NSI*, 460 F.3d at 211).  Here, there is no

dispute that ownership of the business changed hands; thus, regardless of whether the other *de*

*facto* merger factors are present, the *de facto* merger and "mere continuation" exceptions do not

apply.

Accordingly, if the Court were to apply the traditional common law test used in New York state courts, SCFAL would not be held liable as a successor to Cornelia Fifth.

## 2.    Whether to Apply the Broader "Substantial Continuity" Test

Plaintiffs argue that the Court should apply the broader test for successor liability that federal courts typically apply in the labor and employment context.  Under this test, a company that purchases another company's assets may be liable as a successor if there was "'substantial continuity' between the enterprises."  *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43 (1987).  Unlike the traditional common law test, this test does not require continuity of ownership between the two businesses; thus, under this test, SCFAL could potentially be liable as a successor.  The test will be discussed in more detail below, but in sum, courts applying this test to situations in which a business purchases the assets of another business look to whether "(1) the successor had notice of the claim before acquisition"; and (2) "there was substantial continuity in the operation of the business before and after  the sale."  *Rowe Entm't, Inc. v. William Morris Agency, Inc*., 98 Civ. 8272, 2005 WL 22833, at *79 (S.D.N.Y. Jan. 5, 2005) (quoting *Shevack v. Litton Applied Tech.,* No. 95 Civ. 7740, 1998 WL 512959, at *2 (S.D.N.Y. Aug. 19, 1998)).

The Second Circuit has not yet addressed the applicability of the "substantial continuity" test in the FLSA context.  However, several courts outside this Circuit have held that the "substantial continuity" test should be applied to FLSA cases.  *See Steinbach v. Hubbard*, 51 F.3d 843, 845-46 (9th Cir. 1995); *Chao v. Concrete Mgt. Resources, L.L.C.*, No. 08-2501-JWL, 2009 WL 564381, at *3 (D. Kan. Mar. 5, 2009); *Brock v. LaGrange Equip. Co.*, No. CV 86-0-170, 1987 WL 39105, at *1 (D. Neb. July 14, 1987).

District Courts in this Circuit have reached divergent results on this issue.  One Magistrate Judge in this District applied the substantial continuity test in a jury trial under FLSA, but did not provide any analysis as to how he determined that that was the appropriate test.  *See Wong v. Hunda Glass Corp.*, No. 09 Civ. 4402, 2010 WL 2541698, at *1 (S.D.N.Y. June 23, 2010) (noting that the court's finding of successor liability was "based on the fact that there was substantial continuity between the businesses, and there was the same workforce, same job titles, same supervisors, same machinery, and same products" at both businesses).  Courts in the Eastern District of New York have held that the traditional common law successor liability test should apply in FLSA cases.  *See Vasquez v. Ranieri Cheese Corp.*, No. 07 Civ. 464, 2010 WL 1223606 (E.D.N.Y. Mar. 26, 2010); *Kaur v. Royal Arcadia Palace, Inc.*, 643 F. Supp. 2d 276 (E.D.N.Y. 2007).  A court in the District of Connecticut reviewed these precedents, but did not reach a conclusion about which successor liability standard governed, because the court determined that there was successor liability under any of the standards.  *See Medina v. Unlimited Sys., LLC*, 760 F. Supp. 2d 263 (D. Conn. 2010).

The Court does not find persuasive the Eastern District courts' analysis of this issue.  In *Kaur*, the court rejected the defendants' argument that the court should follow the Ninith Circuit in *Steinbach* (and the District of Nebraska in *Brock*) and import the broader "substantial continuity test" from Title VII cases to a FLSA case.  The court cited the Second Circuit's decision in *NSI*, 460 F.3d 201, holding that the traditional common law test outlined above was also the "federal common-law" successor liability test in the context of the Comprehensive Environmental Response Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601, *et seq*.  *Kaur*, 643 F. Supp. 2d at 289 n.10 (citing *NSI*, 460 F.3d at 209).  In *NSI*, the Second Circuit noted that, in accordance with the Supreme Court's holding in *United States v.*

14

*Bestfoods*, 524 U.S. 51 (1998), "when determining whether liability under CERCLA passes from one corporation to another, we must apply common law rules and not create CERCLA-specific rules." *NSI*, 460 F.3d at 205. The court determined that because there was no conflict between the traditional state/common law test for successor liability and the federal interests at issue in CERCLA, the traditional common law test should apply. *Id.* However, that decision was limited to the CERCLA context. Thus, the Court does not agree with the *Kaur* court's conclusion that *NSI* mandated that the traditional common law successor liability test was appropriate in all circumstances. The *NSI* decision did not affect the long-standing application of the broader "substantial continuity" test by federal courts in various labor and employment contexts both before and after *NSI*.[5]

As the Ninth Circuit has explained, "beginning with cases under the National Labor Relations Act ("NLRA"), federal courts have developed a federal common law successorship doctrine that now extends to almost every employment law statute." *Steinbach*, 51 F.3d at 845 (citing *Golden State Bottling Co. v. NLRB,* 414 U.S. 168 (1973) (NLRA); *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323 (7th Cir. 1990) (Multiemployer Pension Plan Amendments Act ("MPPAA")); *Sec'y of Labor v. Mullins,* 888 F.2d 1448 (D.C. Cir. 1989) (Mine Safety and Health Act); *Criswell v. Delta Air Lines, Inc.,* 868 F.2d 1093 (9th Cir. 1989) (Age Discrimination in Employment Act); *Trustees for Alaska*

---

[5] For similar reasons, the Court finds the district court's holding in *Vasquez*, 2010 WL 1223606, unpersuasive. There, the court followed *Kaur*, stating that "[s]ince the Circuit in [*NSI*] suggests that the test for considering successor liability under principles of traditional common law or under New York common law is either the same or substantially similar, and since *Kaur* has, indeed, analyzed FLSA claims under the same framework, this Court is reasonably assured that a similar approach is appropriate" in the case. *Id.* at *10. But, as discussed above, the federal common law test for successor liability in the labor and employment context is not the same as the traditional common law or New York common law test. Also, of note, in both Eastern District opinions, the courts noted that the result of the case would have been the same regardless of which test applied. *See id.* at *10 n.14; *Kaur*, 760 F. Supp. 2d at 289 n. 10. That is not the case here.

*Laborers-Construction Indus. Health & Sec. Fund v. Ferrell,* 812 F.2d 512 (9th Cir. 1987) (ERISA); *Musikiwamba v. ESSI, Inc.,* 760 F.2d 740 (7th Cir. 1985) (42 U.S.C. § 1981); *Bates v. Pac. Mar. Ass'n,* 744 F.2d 705 (9th Cir. 1984) (Title VII)).  As the Connecticut District Court pointed out in *Medina*, Courts in this Circuit have applied this test in, *inter alia*, the Title VII context.  760 F. Supp. 2d at 269 (citing *Molfese v. Fairfaxx Corp.*, No. 05 Civ. 317, 2006 WL 1438582, at *3 (D. Conn. May 12, 2006); *EEOC v. Nichols Gas & Oil, Inc.*, 518 F. Supp. 2d 505, 510-11 (W.D.N.Y. 2007); *Abdel-Khalek v. Ernst & Young, LLP*, No. 97 Civ. 4514, 1999 WL 190790, at *7 (S.D.N.Y. Apr. 7, 1999); *Long v. AT & T Info. Sys., Inc.,* 733 F. Supp. 188, 208 (S.D.N.Y. 1990)).

The Supreme Court originally applied this broader form of successor liability in the NLRA context "to avoid labor unrest and provide some protection for employees against the effects of a sudden change in the employment relationship."  *Steinbach*, 51 F.3d at 845 (citing *Golden State Bottling Co.*, 414 U.S. at 182-85; *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 549 (1964)); *see also Musikiwamba*, 760 F.2d at 750-51 (explaining that imposition of successor liability is to ensure that an employee's statutory rights are not "vitiated by the mere fact of a sudden change in the employer's business").

FLSA's provisions regarding employee wages and hours invoke the same concerns as the other laws for which courts have applied the substantial continuity test.  The Ninth Circuit noted that "FLSA was passed to protect workers' standards of living through the regulation of working conditions," and concluded that "[t]hat fundamental purpose is as fully deserving of protection as the labor peace, anti-discrimination, and worker security policies underlying the NLRA, Title VII, 42 U.S.C. § 1981, ERISA, and MPPAA."  51 F.3d at 845.  The Connecticut District Court pointed out that the Second Circuit "has observed that the FLSA has a 'remedial' purpose, and

that 'Congress intended the statute to have the widest possible impact in the national economy.'"

760 F. Supp. 2d at 267 (quoting *Barfield v. N.Y. City Health & Hosp. Corp.,* 537 F.3d 132, 142

(2d Cir. 2008)) (brackets and quotation marks omitted).[6]

In light of these policy considerations, and the Second Circuit's instruction to use a

"flexible" approach in applying FLSA, *Barfield*, 537 F.3d at 141, the Court agrees with the Ninth

Circuit's conclusion in *Steinbach* that application of the broader "substantial continuity" standard

used in other labor and employment law contexts is appropriate in cases brought under FLSA.

### 3.    The Substantial Continuity Test

The substantial continuity test in the labor relations context looks to "whether the new

company has acquired substantial assets of its predecessor and continued, without interruption or

substantial change, the predecessor's business operations." *Fall River*, 482 U.S. at 43 (citation

and quotation marks omitted).  Courts applying this test typically look at the nine factors

enunciated by the Sixth Circuit in the Title VII discrimination context in *EEOC v. MacMillan*

*Bloedel Containers, Inc.*, 503 F.2d 1086, 1094 (6th Cir. 1974):

> (1) whether the successor company had notice of the charge or pending lawsuit
> prior to acquiring the business or assets of the predecessor; (2) the ability of the
> predecessor to provide relief; (3) whether there has been a substantial continuity
> of business operations; (4) whether the new employer uses the same plant; (5)
> whether he uses the same or substantially the same work force; (6) whether he
> uses the same or substantially the same supervisory personnel; (7) whether the
> same jobs exist under substantially the same working conditions; (8) whether he
> uses the same machinery, equipment, and methods of production; and (9) whether
> he produces the same product.

*Musikiwamba*, 760 F.2d at 750 (paraphrasing *MacMillan Bloedel*).  "No one factor is controlling,

and it is not necessary that each factor be met to find successor liability."  *EEOC v. Barney*

---

[6] Canizales states, without citation to authority, and without elaboration, that "the concern with unfair labor practices going unremedied does not apply outside the union context."  (Defendant Michael Canizales' Memorandum of Law in Support of his Motion for Partial Summary Judgment, Dkt. No. 144, ("Canizales Mem.") at 16.)

*Skanska Const. Co*., 99 Civ. 2001, 2000 WL 1617008, at *2 (S.D.N.Y. Oct. 27, 2000) (citation omitted).

Courts in this District have explained, in the Title VII context, that "[c]ourts considering the appropriateness of imposing successor liability on a purchaser of assets (as distinguished from a purchaser of stock, who acquires the assets and liabilities of the seller) have focused on only two factors from *MacMillan Bloedel*." *Rowe Entm't*, 2005 WL 22833, at *79 (citing *Barney Skanska*, 2000 WL 1617008, at *3). Those factors are: (1) whether the successor had notice of the claim before acquisition, and (2) whether there was substantial continuity in the operation of the business before and after the sale. *Id.* (citing *Shevack*, 1998 WL 512959, at *2). In *Steinbach*, the Ninth Circuit stated that "the extent to which the predecessor is able to provide relief directly" is also relevant. 51 F.3d at 846. That said, the fourth through ninth *MacMillan Bloedel* factors are essentially a subset of factors to consider in determining whether there was "substantial continuity of business operations," and thus remain relevant in any event. *See Musikiwamba*, 760 F.2d at 751 ("The other . . . factors identified in *MacMillan* merely provide a foundation for analyzing the larger question of whether there is a continuity in operations and the work force of the successor and predecessor employers.").

### 4.   Applying the Substantial Continuity Test

The Court finds that there are, at a minimum, genuine issues of material fact as to whether SCFAL (and therefore Canizales) can be liable as a successor under the substantial continuity test.

#### a.  Notice

Canizales correctly points out that Plaintiffs have the burden to show that SCFAL had notice of Plaintiffs' claim prior to the acquisition. *Barney Skanska Const.¸* 2000 WL 1617008, at

*3 (noting that plaintiff has burden of "affirmatively alleging" notice of claim).  "The knowledge of a director, officer, sole shareholder or controlling person of a corporation is imputable to that corporation."  *Baker v. Latham Sparrowbush Associates*, 72 F.3d 246, 255 (2d Cir. 1995).  Given Canizales' role in, and control over, SCFAL, if he had notice of the potential liability, then SCFAL would be deemed to have notice as well.

Plaintiffs contend that Canizales had notice of their claims prior to the acquisition.  In opposition to Canizales' motion, Plaintiff filed the Wells Affidavit to demonstrate that there is a genuine issue of fact as to whether Canizales was aware of the claims for unpaid wages at least two days prior to the closing.

Canizales argues that because Plaintiffs did not file this action until April 27, 2009, more than two months after the closing (on February 6), Canizales could not possibly have had notice of their claims.  According to Canizales, a "putative successor must have notice of the pendency of an actual claim, not notice of a mere failure to pay wages or other conduct by the predecessor giving rise to liability when no employee has asserted a claim."  (Defendant Michael Canizales' Reply Memorandum of Law in Further Support of his Motion for Partial Summary Judgment, Dkt. No. 154, ("Canizales Reply") at 4.)

Canizales also states that in closing the deal for the purchase, he relied upon Cornelia's representation in the APA that it "has not received any notice regarding any violation of, conflict with, or failure to conduct the Business in compliance with, any applicable Law" (APA ¶ 4.8(b)), and its warranty that there had been "no violations of any other Law respecting the hiring, hours, wages, occupational safety and health, employment, promotion, termination or benefits" of any of the employees.  (APA ¶ 4.18(c)).  (Canizales Mem. at 14.)  Canizales argues that he could not

have had any notice of a violation of FLSA when Cornelia Fifth expressly represented and warranted that no such violations existed.

Canizales misconstrues the law on this point. It is true that many decisions finding successor liability were based on notice of actual pending lawsuits. *See, e.g., Nichols Gas & Oil, Inc.*, 518 F. Supp 2d at 512 (holding that where purchase agreement contained schedule listing lawsuit as a pending claim, successor had notice of claim). And several courts in this District that found no successor liability so held because the claims had not yet arisen at the time of the asset transfer. *See, e.g., Shevack*, 1998 WL 512959, at *3 (no notice of discrimination claim because the plaintiff's "claim did not arise until after she was terminated" by the successor). But Canizales does not point to any authority that expressly holds that a plaintiff must have formally brought a claim for a successor to have notice of that claim. On the contrary, although the *MacMillan Bloedel* test examines whether the successor had "notice of the charge," 503 F.3d at 1094, several key decisions in this area speak in terms of notice of "*potential* liability." *Golden State Bottling Co.*, 414 U.S. at 185; *Steinbach*, 51 F.3d at 846 (emphasis added). At least one federal court has expressly held that a defendant's "actual knowledge that back pay was owed to former . . . employees" of the predecessor was sufficient to provide notice of the FLSA claims. *Brock*, 1987 WL 39105, at *2.[7] And courts in this District have held that a successor had notice of a discrimination claim even where no formal claim or charge had yet been filed. *See, e.g., Abdel-Khalek*, 1999 WL 190790, at *7 (holding that there were issues of fact as to the defendant

---

[7] Canizales points out that *Brock* has not been followed by any other decision, and that in that case, the president of the successor company was the same as the president of the predecessor company. The court acknowledged that "[t]he notice inquiry is more significant in the case of a disinterested third party purchase[r] than in a situation involving the same parties on both sides of the transaction." 1987 WL 39105, at *2. Nevertheless, where it is undisputed that there is actual knowledge of a failure to pay by that third party, the distinctions between the two situations dissipate.

successor's notice of discrimination in termination of plaintiff by predecessor and refusal to hire plaintiff by successor, where the plaintiff had notified an executive at the successor that "she believed she was not being hired by [the successor] because of her daughter's medical condition").

As several appellate courts, including the Supreme Court, have explained, the principal reason for the notice requirement is "to ensure fairness by guaranteeing that a successor had an opportunity to protect against liability by negotiating a lower price or indemnity clause." *Steinbach*, 51 F.3d at 847 (citing *Golden State Bottling*, 414 U.S. at 185); *see also Musikiwamba*, 760 F.2d at 752 ("The basis of the notice requirement is that the successor has some time to negotiate a change in the purchase agreement to reflect the potential liability of a lawsuit . . . .").

Canizales states that he became aware "at or about the time of the February 6, 2009 closing of the APA" that Cornelia Fifth had not yet paid its employees their wages for January and February 2009, through the closing date. (Canizales Aff. ¶ 23.)  He concedes that the conversation that was overheard by Plaintiff Wells did take place, and that he knew of Cornelia Fifth's failure to pay the employees' wages at least as of that date. (Canizales Reply Aff. ¶ 3.) Indeed, Canizales states that "[t]he fact that this became an issue caused SCFAL to make sure that the APA required Cornelia Fifth to attend to this important obligation precisely so that SCFAL would not face any unanticipated liability." (*Id.*)  Thus, according to Canizales, he negotiated the various representations and warranties in the APA, as well as the indemnification provisions, at least partially in response to his knowledge of the potential liability for unpaid wages. (*Id.* ¶¶ 3-4.)

In other words, the precise rationale for the notice requirement was served here.  SCFAL had notice of the potential liability and took the opportunity to structure the agreement around

21

the possibility of that liability.  SCFAL or Canizales may very well have valid cross-claims against the Cornelia Defendants based on the alleged breach of the representations and warranties or the indemnity provisions.  But a predecessors' breach of representations and warranties in an asset purchase agreement does not control whether the successor can be held liable under the substantial continuity doctrine.

Canizales is correct that several of the decisions in this District applying the successor liability test in the context of discrimination claims found that there was no notice where the claims were not yet "pending."  *See, e.g., Long*, 733 F. Supp. at 208 (holding that there was no successor liability where it was "undisputed" that the successor had no notice of the claim against the predecessor "because none of [the plaintiff's] charges were pending when he was transferred" to the successor).  But these decisions underscore the difference between discrimination claims and the types of claims at issue here.  In an ordinary discrimination case, it would be very difficult for a third party to have notice of any potential liability for discriminatory practices unless someone in some way complained about those practices.[8]  Thus, in *Rowe*, the court held that the "conclusory statement" that the predecessor "had for years been violating the civil rights of black promoters" was insufficient to provide notice to the successor of these "claims."  2005 WL 22833, at *79.   But with the violation of FLSA at issue in this case—a complete failure to pay incurred wages for over a month—knowledge of the failure to pay alone is sufficient to put a successor on notice of potential liability.

This is not a case of an "innocent purchaser" who "exercised due diligence and failed to uncover evidence" of any potential liability.  *Musikiwamba*, 760 F.2d at 750, 752.  Rather,

---

[8] Of course, one could conceive of a situation where the discrimination was so patent and obvious that a successor could have notice of it, even if no employee had yet asserted a claim based on that discrimination.

SCFAL was fully aware of the potential liabilities to the unpaid employees and attempted to

negotiate the APA accordingly.  Thus, the Court is unable to conclude as a matter of law that

Canizales cannot be liable as a successor to Cornelia Fifth because of a lack of notice of the

claim to SCFAL.

### b.  Substantial Continuity in the Operation of the Business

The Court need not dwell at length on this factor, as it is clear that there are genuine

issues of fact as to whether there was sufficient "substantial continuity" between the two

businesses.

There is no dispute that SCFAL operated its business in the same location as Cornelia

Fifth, and that it hired at least some of Cornelia Fifth's employees.  However, the record is not

clear precisely what percentage of Cornelia's employees were hired by SCFAL, and what

percentage of SCFAL's employees had previously been employed by Cornelia.  Although many

of the supervisory personnel were different between the two businesses, it is not clear how many,

if any, the two businesses had in common.  The record is also not clear on whether the "same

jobs exist[ed] under substantially the same working conditions" or whether they used "the same

machinery, equipment or methods of production," *Musikiwamba*, 760 F.2d at 750, but it is

reasonable to infer, since the businesses were both spas, and SCFAL purchased the operating

assets of Cornelia Fifth, that these factors would likely support a conclusion that there was

substantial continuity.  Finally, Canizales points out—and Plaintiffs do not dispute—that SCFAL

ceased selling Cornelia-branded beauty products, but, again, since both businesses were beauty

spas, it is reasonable to infer that the products sold (in other words, the services offered) were

substantially the same.

Accordingly, drawing all inferences in favor of the non-moving party, as the Court must do on a motion for summary judgment, the Court concludes that there are genuine issues of material fact as to whether there was substantial continuity of business operations.

### c.  Ability of Predecessor to Provide Relief

The Court also concludes that there are genuine issues of fact as to the predecessor's ability to provide relief.  There is no dispute that the principals of Cornelia Fifth—Richard Aidekman and Ellen Ackoff—are in bankruptcy, but that Cornelia Fifth and Zicu technically still exist.  (*See* Canizales Reply at 5.)  However, the record is not at all clear what, if any, assets are held by these entities, and whether they actually have the ability to provide relief for Plaintiffs' claims.

Canizales argues that the proper inquiry is not whether the predecessors currently have the ability to provide relief, but whether they had the ability to provide relief at the time of the acquisition.  (*Id.* at 5-6.)  But that is not precisely true.  Courts have consistently held that the equitable considerations behind successor liability may make it inappropriate "to impose successor liability on an innocent purchaser when the predecessor is fully capable of providing relief."  *Musikiwamba*, 760 F.2d at 750.  Courts have also, at times, held that "it is also relevant whether the predecessor could have provided any or all relief to the plaintiff prior to the transfer of assets."  *Id.*  This is because, just as successor liability is meant to ensure that "an injured employee [] not be made worse off by a change in the business," "neither should an injured employee be made better off."  *Id.*  Under this view, if the predecessor would not have been able to provide the relief in the first place, it may be unfair—and may "severely inhibit the reorganization or transfer of assets of a failing business"—to impose liability on a successor.  *Id.*

at 751; *see also Steinbach*, 51 F.3d at 847 (noting that "the purpose of successorship liability is not to provide windfalls for employees").

In any event, there are, at a minimum, genuine issues of fact as to whether the predecessors could have provided relief before the transfer, or could do so now.

In sum, the Court determines that there are genuine issues of fact as to whether SCFAL meets the requirements for the imposition of successor liability under the substantial continuity test.  Accordingly, the Court denies Canizales' motion for summary judgment on that issue.

### B.    Joint and Several Liability of Canizales

Canizales argues that he cannot be held personally liable, even if SCFAL is found to be liable as a successor, because he was not personally a successor to Cornelia Fifth; SCFAL entered into the APA, not Canizales.

It is black letter law that a limited liability company exists as a separate entity from its members.  *See Morris v. New York State Dep't of Taxation and Finance*, 82 N.Y.2d 135, 140, 603 N.Y.S.2d 807, 810 (1992) ("[A] corporation exists independently of its owners, as a separate legal entity . . . ."); *Weber v. King*, 110 F. Supp. 2d 124, 128 (E.D.N.Y. 2000) (stating that "[u]nder New York's Limited Liability Company Law, an LLC is a 'separate legal entity,'" and its members are "afforded corporate-like limited liability protection" (citation omitted)). Canizales argues that Plaintiffs would have to meet the heavy burden to pierce the corporate veil in order to hold him personally liable as a successor to Cornelia Fifth.

As Plaintiffs point out, Canizales misconstrues the basis for his potential liability. Canizales is not potentially liable under a veil-piercing analysis, but rather is potentially jointly and severally liable with SCFAL as an "employer" of the plaintiffs under FLSA.

25

The definitions of "employer" and "employee" under FLSA are "strikingly br[oad]," "stretch[ing] the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).[9]  This is done "in order to effectuate the remedial purposes of the act." *Barfield*, 537 F.3d at 141 (citation omitted); *see also Falk v. Brennan*, 414 U.S. 190, 195 (1973) (noting "expansiveness" of FLSA's definition of employer).  Thus, an "employer" under the statute is not merely the entity for which the employee works, but can also be an individual principal or manager of that entity.  *See Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 140 (2d Cir. 1999).  Courts are to look to "economic reality rather than technical concepts" to ground their decisions regarding whether a person or entity falls under the definition of "employer." *Barfield*, 537 F.3d at 141.  As then-District Judge Lynch held, "[t]he overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Moon v. Kwon*, 248 F. Supp. 2d 201, 237 (S.D.N.Y. 2002) (collecting cases) (citation omitted).

Canizales was indisputably a "part owner and member" of SCFAL, as well as "an officer, director and shareholder of a related entity, Spa Chakra, Inc."  (Canizales Aff. ¶ 2.)  Canizales also stated that he was "in charge of operations" at SCFAL.  (*Id.* ¶ 27.)  This evidence is sufficient to create a triable issue of fact as to whether he can be held jointly and severally liable as an "employer" with SCFAL.

---

[9] The statute defines an "employee" as "any individual employed by an employer."  29 U.S.C. § 203(e).  An "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  To "employ" "includes to suffer or permit to work."  29 U.S.C. § 203(g).

In light of these issues of material fact, the Court denies Canizales' motion for summary judgment as to his liability to Plaintiffs.

### III.    Motion for Summary Judgment Regarding Cross-Claims

Canizales also moves for summary judgment on the Cornelia Cross-Claimants' cross-claims for indemnification under the APA.

The Cornelia Cross-Claimants each asserted a cross-claim against Canizales and SCFAL, alleging that pursuant to the APA, Canizales and SCFAL "are obligated to pay certain monies and to assume and pay certain obligations, and are obligated to indemnify" the Cornelia Cross-Claimants "for any third-party actions brought against them related to any failure on their part" to meet those obligations.  (Cornelia Defendant Cross-Claims, Dkt. Nos. 111-14, ¶ 2.)

Canizales argues that he cannot be held personally liable as an indemnitor under the APA because he is not personally a signatory to the APA (although he did sign the APA in his capacity as Chief Executive Officer of SCFAL), and was not a party to any contract with the Cornelia Cross-Claimants.  (*See* APA at 40.)  As previously explained, a member of an LLC ordinarily cannot be held personally liable for the acts of the LLC.  *See Weber*, 110 F. Supp. 2d at 128.  New York law establishes two requirements for piercing the corporate veil and thus holding an individual liable for corporate action: "1) the owner exercised complete domination over the corporation with respect to the transaction at issue, and 2) such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil."  *MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 63 (2d Cir. 2001) (citation and internal quotation marks omitted).  Factors that courts consider when determining whether it is appropriate to pierce the corporate veil include:

27

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*William Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 139 (2d Cir. 1991) (citations omitted).  Canizales argues that the Cornelia Cross-Claimants cannot show the "extraordinary circumstances" that would justify piercing the corporate veil.  *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996).

In response to Canizales' arguments, the Cornelia Cross-Claimants offer only vague assertions that "Michael Canizales was the *de facto* entity negotiating this agreement and handling the assets of the Purchaser which were turned over in connection with the sale," and that because it was "his role to determine whether those assets were used as agreed  to or diverted to other areas," "he should be held liable under the Buyer's indemnity obligation as the primary representative of the Buyer as its Chief Executive Officer."  (Defendant Cornelia Fifth Avenue, LLC, Cornelia Zicu International, LLC, Cornelia International 401(K) Plan, Richard Aidekman, and Ellen Sackoff, Memorandum of Law in Opposition to Defendant Michael Canizales' Motion for Partial Summary Judgment, Dkt. No. 152, at 4.)

While it is true that the Court grants the non-moving party all reasonable favorable inferences on a motion for summary judgment, a non-movant may not defeat summary judgment with mere "conclusory allegations."  *Scotto*, 143 F.3d at 114.  The Cornelia Cross-Claimants

28

offer no evidence to meet their heavy burden to show that the LLC form should be pierced and Canizales held liable for SCFAL's obligations.  Thus, the Court grants Canizales' motion for summary judgment dismissing the Cornelia Cross-Claimants cross-claims against him.

**IV.    Conclusion**

For the reasons stated above, Defendant Michael Canizales' motion for partial summary judgment is GRANTED in part and DENIED in part.  The motion for summary judgment dismissing Plaintiffs' second, third, sixth, and seventh causes of action as against Canizales is GRANTED.  The motion for summary judgment regarding Canizales' liability for the first cause of action under FLSA is DENIED.  The motion for summary judgment dismissing the cross-claims against Michael Canizales by Cornelia Fifth Avenue, LLC, Cornelia Zicu International, LLC, Richard Aidekman and Ellen Sackoff is GRANTED, and those cross-claims are hereby dismissed.

The Clerk of Court is directed to close this motion (Dkt. No. 140).

SO ORDERED.

Dated: New York, New York
       May 24, 2012

_____
J. PAUL OETKEN
United States District Judge